UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

GIRMAI ZEROM,

                 Petitioner,                            Hon. Wendell A. Miles

v.                                         Case No. 1:05-CV-279

DOUG VASBINDER,

                 Respondent.

_____/

## <u>REPORT AND RECOMMENDATION</u>

       This matter is before the Court on Zerom's petition for writ of habeas corpus. In accordance with 28 U.S.C. § 636(b) authorizing United States Magistrate Judges to submit proposed findings of fact and recommendations for disposition of prisoner petitions, the undersigned recommends that Zerom's petition be **denied**.

## <u>BACKGROUND</u>

       As a result of his alleged involvement in a robbery on August 27, 2001, Petitioner was charged with armed robbery, assault with the intent to commit great bodily harm less than murder, and possession of a firearm during the commission of a felony. Several individuals testified at Petitioner's jury trial. The relevant portions of this testimony is summarized below.

1

**Michael Abraham**

As of August 27, 2001, Abraham was employed as a police officer with the City of Muskegon.  (Trial Transcript, 345-46).  At approximately 7:00 p.m. that evening, Abraham was dispatched to 1527 Madison Street to investigate a home invasion and armed robbery.  (Tr. 346-47).  Joel Wyrick, an 89 year-old man possessing only one leg, lived at this location.  (Tr. 347, 352).  When Abraham arrived at the location, emergency personnel were treating Wyrick's injuries.  (Tr. 347-48, 352).

**Gregory Bonebrake**

As of August 27, 2001, Bonebrake was employed as a police officer with the City of Muskegon.  (Tr. 383).  On this particular evening, Bonebrake was dispatched to Joel Wyrick's residence to collect evidence.  (Tr. 383).  Immediately after entering the front of the residence, Bonebrake observed a blood-soaked paper towel on a table and a blood-soaked hand towel laying on the floor.  (Tr. 397).  An examination of the "entryway going into the bedroom" revealed the presence of a "blood spot at the base of the door."  (Tr. 402).

In the bedroom, Officer Bonebrake discovered a filing cabinet, the drawers of which had been "torn apart" and their contents "spilled out onto the floor."  (Tr. 402-03).  The cord to the bedroom telephone had been "pulled from the wall."  (Tr. 403).  Bonebrake testified that the bedroom had been "completely ransacked."  (Tr. 403).  Wyrick's wheelchair was discovered in the living room.  (Tr. 405).  Officer Bonebrake discovered several other telephones in the residence, all of which had been rendered inoperable.  (Tr. 404-07).

A blood-soaked dishtowel was discovered on the kitchen floor.  (Tr. 407-08).  An

2

empty prescription bottle was located on the kitchen counter.  (Tr. 408-10).  Officer Bonebrake subsequently learned that this prescription was last filled on July 20, 2001, with 90 Hydracodeine pills.  (Tr. 409-10).  In the mudroom, located in the rear of the residence, a shovel was discovered. (Tr. 411-12).  Bonebrake observed "blood spots" on the floor leading from the mudroom into the kitchen. (Tr. 413-14).  Bonebrake preserved samples of several of the blood spots that he discovered on the floor and telephones.  (Tr. 416).

As part of the investigation, another officer instructed Bonebrake to search the residence in an attempt to locate a .12 gauge shotgun and a "small caliber" handgun.  (Tr. 418). Bonebrake did not discover either weapon, but he did find ammunition for "both weapons."  (Tr. 418).  Bonebrake also discovered, hidden in the bedroom closet, a .30 caliber rifle.  (Tr. 418-19).

**Jeffrey Botsford**

As of August 27, 2001, Botsford and his wife Tonya lived next door to Joel Wyrick. (Tr. 423-25).  Botsford testified that between 5:00 and 5:30 p.m. he observed a white man approach the front door of Wyrick's residence.  (Tr. 425-26).  This man knocked on Wyrick's front door and then entered the residence.  (Tr. 426).  Botsford then "went back to doing whatever [he] was doing in the house."  (Tr. 428).  Botsford described this man as approximately 30 years old, six feet two inches tall, weighing 220 pounds, with "shaved" brownish-black hair.  (Tr. 426).

A short time later his daughters told him that "Joel's bleeding."  (Tr. 428).  Botsford went over to Wyrick's home and saw "Joel's head peeking out the door."  (Tr. 428).  Botsford could see that Wyrick was bleeding from the top of his head.  (Tr. 428-29).  Wyrick told Botsford that he had been robbed.  (Tr. 429).  Botsford told his wife to telephone 911 and then he attempted to care

for Wyrick until paramedics arrived.  (Tr. 429-30).  Botsford described for his wife the man he saw

enter Wyrick's residence the previous afternoon.  (Tr. 434).  After hearing this description, Tonya

Botsford stated that she thought the man was Anthony Puente.  (Tr. 434).

      The following day Botsford spoke with Jerri Puskeritz, who had stopped at Botsford's

residence to inquire about Joel Wyrick.  (Tr. 431).  During this conversation, Botsford described to

Puskeritz the man he saw enter Wyrick's home the previous afternoon.  (Tr. 431).  Puskeritz then

departed, but returned later that evening, at which point she and Botsford had another conversation.

(Tr. 432).  Based upon the content of this latter conversation, Botsford contacted Detective Chris

Burnham.  (Tr. 432).  Botsford informed Detective Burnham that he thought that the person he saw

enter Wyrick's residence the previous day was Anthony Puente.  (Tr. 432-33).

**Joel Wyrick**

      Wyrick testified that he was 90 years old and that his eyesight was "not too good."

(Tr. 437-40).  Wyrick indicated that he used to be married to a woman named Edith, who had a

daughter from a previous relationship, named Jerri.  (Tr. 440-41).  Jerri had two grandchildren, Tony

and Rachel Puente.  (Tr. 440-41, 459, 469).

      On August 27, 2001, Tony Puente arrived at Wyrick's home to perform some

household repairs.  (Tr. 441-42).  Shortly after Tony arrived, a black man and a "blond-headed"

woman entered Wyrick's home.  (Tr. 443-44, 449).  The man was carrying a weapon.  (Tr. 448).  He

pointed the weapon at Wyrick and demanded "where's the diamonds at?" (Tr. 457).  Wyrick showed

the man where the diamonds were located, after which the woman hit Wyrick twice in the head with

a shovel, knocking him out of his wheel chair.  (Tr. 443-44, 447, 449-50, 458).  Wyrick was unable

4

to identify his assailants because they were wearing masks.  (Tr. 444-46, 459, 467-68).

The robbers stole cash, diamonds, watches, Wyrick's checkbook, a cordless telephone, a shotgun, a .25 caliber pistol, and ammunition for both weapons.  (Tr. 451-56, 466-67). While the robbery was occurring, Tony Puente told Wyrick "don't say nothing, don't say nothing, let them get the stuff and get going."  (Tr. 458-59).  After the robbers departed the residence, Wyrick told Tony Puente to telephone 911.  (Tr. 463-64).  Puente indicated that he would do so, but instead he left the house and never returned.  (Tr. 464-65).  Wyrick was forced to crawl outside his front door where a young girl saw him.  (Tr. 464-65).

**Tony Puente**

Puente testified that he had already been convicted and sentenced for his participation in the robbery of Joel Wyrick on August 27, 2001.  (Tr. 475-76).  Puente indicated that he was not testifying pursuant to a plea agreement and that he had received no promises in return for his testimony.  (Tr. 476-77).  Puente indicated that he requested the opportunity to testify because, "I owe I think - - I really do think I owe my grandfather that much."  (Tr. 477-84).

On August 27, 2001, Petitioner (a.k.a. Ox) visited Puente's home.  (Tr. 485-92). During this visit, Petitioner, Tony Puente, Rachel Puente (Tony Puente's sister), and Mindy Puente (Tony Puente's wife) discussed robbing Joel Wyrick.  (Tr. 485-92).  The group knew that Wyrick possessed diamonds because he had informed family members of such.  (Tr. 519).  The group also suspected that Wyrick had money because he had loaned money in the past to family members.  (Tr. 493).

The group agreed that Tony Puente would "go kind of distract [Wyrick], keep him

5

company, so they could go through and try to find his wallet."  (Tr. 493-94).  When Tony Puente informed the group that Wyrick maintained weapons in his home, Mindy Puente responded, "have Ox grab the gun and scare my grandfather with it."  (Tr. 495-96).  Petitioner agreed to do so.  (Tr. 495).  Mindy and Rachel Puente agreed to act as lookouts and Tony Puente agreed to act like Petitioner was robbing him as well.  (Tr. 496-97).  Petitioner indicated that the group (except Tony Puente) would need to wear masks to conceal their identity.  (Tr. 497-99).  The group also agreed to wear gloves or socks over their hands to prevent fingerprints.  (Tr. 499-500).

Later that day, Tony Puente arrived at Wyrick's home and entered through the front door.  (Tr. 507).  Puente sat down in the living room and began visiting with Wyrick.  (Tr. 507).  Approximately five minutes later, Tony Puente "heard a noise toward the back of the house."  (Tr. 509).  Puente walked to the rear of the house to investigate.  (Tr. 509-11).  When Puente returned to the living room, Wyrick was laying on the floor and bleeding from his head.  (Tr. 512).

Petitioner then exited Wyrick's bedroom carrying a shotgun. (Tr. 512-13).  Petitioner was wearing a mask over his face and socks on his hands.  (Tr. 513-14).  Petitioner pointed the shotgun at Wyrick and demanded to know "where the fucking diamonds and money" were located. (Tr. 520).  Wyrick grabbed the barrel of the shotgun and began struggling with Petitioner.  (Tr. 521). Petitioner responded by kicking Wyrick in the face "numerous times."  (Tr. 521).  Petitioner then gathered the diamonds, cash, a checkbook, the shotgun, a pistol, and ammunition and departed the residence.  (Tr. 521-28, 538).  After Petitioner departed, Wyrick told Tony Puente to "get help."  (Tr. 525).  Puente departed the residence (without summoning assistance) and returned home, where he reunited with Petitioner, his sister, and his wife.  (Tr. 521-28).  Petitioner used the cash he stole from Wyrick to purchase marijuana.  (Tr. 543-45).  The following day, Petitioner, with Tony Puente's

6

assistance, "shaved" off his hair.  (Tr. 546-48).  Petitioner then pawned Wyrick's shotgun to obtain money to purchase more marijuana.  (Tr. 550-52).

**Mindy Puente**

Puente testified as part of a plea agreement, pursuant to which she agreed to plead guilty to armed robbery.  (Tr. 634-36).  In return, the prosecution agreed not to charge Puente as an habitual offender.  (Tr. 635).

On August 27, 2001, Mindy Puente, Petitioner, Rachel Puente, and Tony Puente discussed robbing Joel Wyrick.  (Tr. 646-47).  The group agreed that Tony Puente would enter Wyrick's home first in an attempt to distract Wyrick, a "few minutes" after which Petitioner would enter the house through the back door and commit the robbery.  (Tr. 647-48, 650, 655-56).  Mindy and Rachel Puente agreed to act as look outs.  (Tr. 648).  The group was aware that Wyrick kept a shotgun behind his bedroom door.  (Tr. 648-49).  The group also agreed to wear masks to conceal their identity and wear gloves or socks on their hands to prevent fingerprints.  (Tr. 650-52).  As the group walked to Wyrick's home to commit the robbery, the group decided to assault Wyrick as part of the robbery.  (Tr. 657-58).  Petitioner agreed to assault Wyrick.  (Tr. 658).

A "couple minutes" after Tony Puente entered Wyrick's home, Mindy Puente, Rachel Puente, and Petitioner entered Wyrick's home through the back door and walked into the kitchen.  (Tr. 659-61, 664-66).  The three were wearing masks.  (Tr. 661-62).  A few moments later, Tony Puente exited the house.  (Tr. 665-67).  Petitioner then grabbed a shovel and proceeded into the living room to commit the robbery.  (Tr. 667-69).  As Petitioner entered the living room he struck Wyrick three times with the shovel.  (Tr. 669-70).  Petitioner then started yelling to Wyrick to give

him his money and his diamonds.  (Tr. 670, 676).  A short time later, Petitioner returned to the kitchen and the trio departed the residence and returned to Mindy Puente's residence.  (Tr. 673-78).

        After returning to the Puente residence, Petitioner revealed what he had stolen: two guns, diamonds, Wyrick's wallet, $81 cash, jewelry, ammunition, blank checks, and medication.  (Tr. 679-82).  Later that night the group purchased marijuana with the cash obtained during the robbery.  (Tr. 682-83).  The following day, Petitioner cut all his hair off.  (Tr. 662-63).  Wyrick's shotgun was pawned for $30 which the group used to purchase more marijuana.  (Tr. 687).

**Rachel Puente**

        Puente testified as part a plea agreement, pursuant to which she agreed to plead guilty to armed robbery.  (Tr. 737-39).  In return, Puente was promised that the minimum sentence she would receive on the armed robbery conviction would not exceed 85 months.  (Tr. 738).

        On August 27, 2001, Rachel Puente, Mindy Puente, Tony Puente, and Petitioner discussed robbing Joel Wyrick.  (Tr. 742-43, 747-49).  They agreed that Tony Puente would arrive at Wyrick's house first and "act like he was visiting" with Wyrick.  (Tr. 749).  Approximately "five to ten" minutes later the rest of the group would enter the house to commit the robbery.  (Tr. 754).  The group agreed to wear masks to hide their identity and to wear gloves or socks over their hands to prevent fingerprints.  (Tr. 749-51).  Petitioner also indicated that he would disable the telephones so Wyrick could not contact the police.  (Tr. 756-57, 792).

        Shortly after Tony Puente entered Wyrick's residence the rest of the group entered the house through the back door.  (Tr. 774-80).  A few moments later, Tony Puente exited the house.  (Tr. 780-83).  Petitioner then grabbed a shovel and struck Wyrick "two or three" times in the head.

(Tr. 783-86).  After attacking Wyrick, Petitioner retrieved a shotgun from Wyrick's bedroom.  (Tr. 793).  Petitioner told Wyrick that if he did not give him the money and the diamonds he would kill him.  (Tr. 793-94, 797).  Wyrick grabbed the shotgun, at which point Petitioner kicked him in the face.  (Tr. 794-95).  Petitioner then proceeded through the house gathering items, after which Petitioner, Mindy Puente, and Rachel Puente departed the residence.  (Tr. 797-98).

The trio returned to the Puente residence where they were reunited with Tony Puente.  (Tr. 798-801).  Petitioner then revealed the items stoled from Wyrick: a shotgun, a handgun, approximately $80 cash, a wallet, a cordless telephone, a camera, watches, rings, jewelry, medication, and ammunition.  (Tr. 801-05, 809-10).  The following day the group pawned the shotgun for $30.  (Tr. 813-19).  Later that day Petitioner shaved off all his hair.  (Tr. 820-21).


**Barbara Puente**

Barbara Puente is the mother of Tony and Rachel Puente.  (Tr. 865-66).  Puente testified that during the "early afternoon hours" of August 27, 2001, Petitioner visited her home.  (Tr. 886).  Rachel Puente, Tony Puente, and Mindy Puente were also present at the time.  (Tr. 886).  Between 4:00 p.m. and 5:00 p.m., Petitioner, Rachel Puente, Tony Puente, and Mindy Puente departed her home together.  (Tr. 890-91).

Approximately 90 minutes later, Tony Puente returned home.  (Tr. 897).  He was "upset and crying" and told his mother that "Grandpa Joel's all right."  (Tr. 897, 902).  When Barbara Puente asked what he meant by that statement, Tony Puente just "cried."  (Tr. 902).  Barbara Puente then asked her son "what's going on?"  (Tr. 904).  Tony Puente then informed his mother that Petitioner had robbed and assaulted Joel Wyrick.  (Tr. 904-08).  A short while later, Petitioner,

9

Rachel Puente, and Mindy Puente returned to Barbara Puente's home.  (Tr. 908-10).  When they returned, Petitioner had in his possession jewelry, watches, a shotgun, a handgun, bingo chips, a ring, and a box of checks  (Tr. 909-13).

**Chris Turgeon**

On August 28, 2001, Turgeon was employed at Golddigger's pawnshop.  (Tr. 955-56).  On that date, Petitioner attempted to pawn a ring, but Turgeon declined the item.  (Tr. 958-59).

**Robert Anderson**

On August 28, 2001, Anderson was employed at The Pawn Palace.  (Tr. 981-82).  On that date, Anderson purchased a shotgun from Rachel Puente for $30.  (Tr. 982-87).  Rachel Puente was accompanied by Tony Puente, another female, and Petitioner.  (Tr. 987).  After learning about a recent robbery in which weapons were stolen, Anderson contacted the police who seized the shotgun.  (Tr. 986).

**Michelle Bernard**

As of August 27, 2001, Bernard lived "directly across the street" from Joel Wyrick. (Tr. 1104-05).  At approximately 5:30 p.m. on that date, Bernard observed three people "walking through the alley" next to Wyrick's house.  (Tr. 1106-07).  One of the individuals was a black male and the other two were white females.  (Tr. 1108).

Bernard observed these three individuals "slowly walking from the back of [Wyrick's] house towards [Bernard's] house, stopping, looking, going over towards [Wyrick's]

10

house." (Tr. 1109). Bernard further testified that these three individuals "would stop periodically and look around at [Wyrick's] house, turn around and look behind them." (Tr. 1109). When Bernard saw these three individuals open the fence into Wyrick's yard she opened her door, at which point the three individuals began walking down the alley away from Wyrick's house. (Tr. 1110-13). Bernard had to then attend to something else and did not see the individuals again. (Tr. 1113). Bernard testified that Petitioner was one of the three people she observed in the alley near Wyrick's house that afternoon. (Tr. 1116-17).

**Margaret Austin**

As of August 27, 2001, Austin lived near Joel Wyrick. (Tr. 1145-50). Austin was sitting on her porch that afternoon, when she observed four individuals walk past her house. (Tr. 1151). Austin testified that the group consisted of one black male, one white male, and two white females. (Tr. 1152). After walking past Austin's house, the white male "kept straight towards Madison Street" while the other three individuals "turned and went down the alley." (Tr. 1152). Austin identified Petitioner as the black male in this group. (Tr. 1154-55).

**Girmai Zerom**

Petitioner denied participating in the robbery of Joel Wyrick. (Tr. 1277). Petitioner acknowledged that he visited the Puente residence on the day that Wyrick was robbed, but denied hearing any of the Puentes discussing the robbery. (Tr. 1290-91). Petitioner acknowledged that he accompanied the Puentes to various pawnshops the day after the robbery. (Tr. 1277-78). Petitioner asserted that Rachel Puente asked him to accompany them to the pawnshops because he possessed

11

better communication skills.  (Tr. 1278).  Petitioner also acknowledged shaving his hair off the day

following the robbery, but asserted that he did so because he could not afford the type of hairstyle

he really wanted.  (Tr. 1281-82, 1293).

Following a jury trial, Petitioner was convicted of armed robbery, assault with the

intent to commit great bodily harm less than murder, and possession of a firearm during the

commission of a felony.  (Tr. 1442-43).  Petitioner received sentences of 13-30 year on the armed

robbery conviction; 4-10 years on the assault conviction; and 2 years for possessing of a firearm

during the commission of a felony.  (Sentencing Transcript, May 13, 2002, 20).  Petitioner appealed

his conviction to the Michigan Court of Appeals asserting the following claims:

> I.  The prosecution failed to provide sufficient credible evidence to sustain a jury verdict of guilty of the crimes of armed robbery, assault with intent to commit great bodily harm less than murder and felony firearm.
>
> II.  The trial court erred and denied Defendant a fair trial in admitting hearsay statements by co-defendant Anthony Puente implicating Defendant as the perpetrator of the crimes, as statements of a co-conspirator, MRE 801(d)(2)(E), where the statements were not made during the course and in furtherance of the conspiracy.
>
> III.  Defendant was denied his right to a fair trial under the Michigan and federal constitutions by the intentional prosecutorial misconduct, in his improper and highly prejudicial argument to the jury when he: vouched for the credibility of his witnesses; bolstered the validity of his case, denigrated the Defendant, his defense, and defense witnesses; argued facts not in evidence; mischaracterized the evidence; argued civic duty and sympathy for the victim as a basis to convict.

The Michigan Court of Appeals affirmed Petitioner's conviction.  *People v. Zerom,*

12

No. 241440, Opinion (Mich. Ct. App., Oct. 16, 2003).  Asserting the same claims, Petitioner then moved in the Michigan Supreme Court for leave to appeal.  The court denied Petitioner's request for leave to appeal, stating that "we are not persuaded that the questions presented should be reviewed by this Court."  *People v. Zerom*, No. 125118, Order (Mich., April 30, 2004).  On April 13, 2005, Petitioner filed in this Court a petition for writ of habeas corpus in which he asserted the same three claims identified above.

## STANDARD OF REVIEW

Zerom's petition, filed April 13, 2005, is subject to the provisions of the Antiterrorism and Effective Death Penalty Act (AEDPA), as it amended 28 U.S.C. § 2254.  The AEDPA amended the substantive standards for granting habeas relief under the following provisions:

> (d)  An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim —
>
> (1)  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, or
>
> (2)  resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

The AEDPA has "modified" the role of the federal courts in habeas proceedings to "prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the

13

extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002).

Pursuant to § 2254(d)(1), a decision is "contrary to" clearly established federal law when "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000); *see also, Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003).

Prior to *Williams*, the Sixth Circuit interpreted the "unreasonable application" clause of § 2254(d)(1) as precluding habeas relief unless the state court's decision was "so clearly incorrect that it would not be debatable among reasonable jurists." *Gordon v. Kelly*, 2000 WL 145144 at *4 (6th Cir., February 1, 2000); *see also*, *Blanton v. Elo*, 186 F.3d 712, 714-15 (6th Cir. 1999).  The *Williams* Court rejected this standard, indicating that it improperly transformed the "unreasonable application" examination into a subjective inquiry turning on whether "at least one of the Nation's jurists has applied the relevant federal law in the same manner" as did the state court. *Williams*, 529 U.S. at 409.

In articulating the proper standard, the Court held that a writ may not issue simply because the reviewing court "concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams,* 529 U.S. at 411.  Rather, the Court must also find the state court's application thereof to be *objectively* unreasonable. *Bell*, 535 U.S. at 694; *Williams*, 529 U.S. at 409-12.  Accordingly, a state court unreasonably applies clearly established federal law if it "identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular. . .case" or "if the state court either unreasonably extends a legal principle from [the Supreme Court's]

14

precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Lancaster*, 324 F.3d at 429 (quoting *Williams*, 529 U.S. at 407).

Furthermore, for a writ to issue, the Court must find a violation of Supreme Court authority.  The Court cannot look to lower federal court decisions in determining whether the relevant state court decision was contrary to, or involved an unreasonable application of, clearly established Federal law. *See Harris v. Stovall*, 212 F.3d 940, 943-44 (6th Cir. 2000).

Pursuant to 28 U.S.C. § 2254(d)(2), when reviewing whether the decision of the state court was based on an unreasonable determination of the facts in light of the evidence presented, the factual findings of the state court are presumed to be correct. *See Warren v. Smith*, 161 F.3d 358, 360 (6th Cir. 1998) (citing 28 U.S.C. § 2254(e)(1)).  Petitioner can rebut this presumption only by clear and convincing evidence. *Id.*

## ANALYSIS

I.        **Sufficiency of the Evidence Claim**

Petitioner asserts that he is entitled to habeas relief because the prosecution failed to present "sufficient credible evidence" to support his convictions.  Claims challenging the sufficiency of the evidence are governed by the standard articulated in *Jackson v. Virginia*, 443 U.S. 307 (1979), pursuant to which it must be determined whether viewing the evidence in the light most favorable to the prosecution and according the benefit of all reasonable inferences to the prosecution, any rational trier of fact could have found Petitioner guilty beyond a reasonable doubt. *See O'Hara v. Brigano*, 499 F.3d 492, 499 (6th Cir. 2007) (citing *Jackson*, 443 U.S. at 319-26).

15

When assessing whether there exists sufficient evidence to support a conviction the Court may not weigh the evidence, assess the credibility of the witnesses, or substitute its judgment for that of the jury. *See United States v. Paige*, 470 F.3d 603, 608 (6th Cir. 2006). Furthermore, where the record supports conflicting inferences the Court "must presume - even if it does not affirmatively appear in the record - that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *O'Hara*, 499 F.3d at 499 (quoting *Jackson*, 443 U.S. at 326).

Under Michigan law in effect as of the date Petitioner committed the acts for which he was convicted, the elements of assault with the intent to commit great bodily harm less than murder were: (1) an attempt or threat with force or violence to do corporal harm to another (an assault); and (2) an intent to do great bodily harm less than murder. *See People v. Parcha*, 575 N.W.2d 316, 318 (Mich. Ct. App. 1997). This is a specific intent crime, but "[t]he specific intent necessary to constitute the offense may be found in conduct as well as words." *People v. Mack*, 317 N.W.2d 190, 193 (Mich. Ct. App. 1981).

Under Michigan law then in effect, the elements of armed robbery were: (1) an assault; (2) a felonious taking of property from the victim's presence or person; and (3) while the defendant is armed with a weapon identified in the relevant statute. *See People v. Turner*, 540 N.W.2d 728, 734 (Mich. Ct. App. 1995). Finally, to be convicted of possessing a firearm during the commission of a felony, the prosecution had to establish that Petitioner carried or had in his possession a firearm at the time he committed or attempted to commit a felony. Mich. Comp. Laws § 750.227b.

As detailed above, the testimony of Tony Puente, Rachel Puente, and Mindy Puente

establish that Petitioner committed the crimes of which he was convicted. The testimony of Chris Turgeon, Robert Anderson, Michelle Bernard, and Margaret Austin further supports Petitioner's convictions. Despite the overwhelming evidence of his guilt presented at trial, Petitioner maintains that his convictions must be overturned because "the only evidence that directly connected [him] with these crimes was the testimony of the Puentes, all of whom were related by blood or marriage." This fact, while relevant, is but one factor which jurors may consider when assessing the credibility of a witness. As noted above, credibility determinations are resolved by the trier of fact and the Court may not substitute its judgment for that of the jury.

The Michigan Court of Appeals concluded that viewing the evidence in this matter in a light most favorable to the prosecution, and according the benefit of all reasonable inferences to the prosecution, a reasonable juror could certainly have found Petitioner guilty beyond a reasonable doubt of armed robbery, assault with the intent to commit great bodily harm less than murder, and possession of a firearm during the commission of a felony. *People v. Zerom*, No. 241440, Opinion at 2 (Mich. Ct. App., Oct. 16, 2003). In light of the above authority and facts, the Court concludes that this decision is neither contrary to, nor involves an unreasonable application of, clearly established federal law. Furthermore, this decision was not based on an unreasonable determination of the facts in light of the evidence presented. Accordingly, this claim raises no issue upon which habeas relief may be granted.

## II.        Evidentiary Claim

As detailed above, Barbara Puente testified as to several statements made by her son after participating in the robbery and assault of Joel Wyrick. Petitioner objected to the admission

17

of this testimony on the grounds that it constituted inadmissible hearsay. (Trial Transcript 897-900). The trial court disagreed, finding that Tony Puente's statements to his mother were admissible as statements made during the course of and in furtherance of a conspiracy. (Tr. 900-01). Petitioner claims that he in entitled to habeas relief as a result of this evidentiary ruling.

To establish constitutional error, Petitioner cannot simply argue that the trial court's evidentiary ruling was improper, as "federal habeas corpus relief does not lie for errors of state law." *Estelle v. McGuire*, 502 U.S. 62, 67 (1991). Rather, Petitioner must establish that his conviction violated the Constitution, laws, or treaties of the United States. *Id.*

Generally, errors by a state court on matters involving the admission or exclusion of evidence are not cognizable in a federal habeas proceeding. *See Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003). However, if "an evidentiary ruling is so egregious that it results in a denial of fundamental fairness, it may violate due process and thus warrant habeas relief." *Id.* Fundamental fairness does not, however, "require a perfect trial," *Clemmons v. Sowders*, 34 F.3d 352, 358 (6th Cir. 1994), and courts have defined those violations that violate fundamental fairness "very narrowly." *Bugh*, 329 F.3d at 512. State court evidentiary rulings do not offend due process unless they violate "some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental." *Id.* (citations omitted).

The decision by the trial judge to admit the testimony in question was reasonable and did not deprive Petitioner of a fair trial. Furthermore, considering that Petitioner had the opportunity to cross-examine Tony Puente about the comments at issue and the circumstances in which they were made, the Court fails to discern how the admission of Barbara Puente's testimony deprived Petitioner of a fair trial. *See, e.g., Crawford v. Washington*, 541 U.S. 36 (2004) (it does not offend the

18

Constitution to admit hearsay testimony if hearsay declarant testifies at trial and is subject to cross-examination).  Accordingly, this claim raises no issue upon which habeas relief may be granted.

**III.       Prosecutorial Misconduct**

Petitioner asserts that the prosecuting attorney engaged in misconduct, depriving him of his constitutional right to a fair trial.  Specifically, Petitioner asserts that various comments made by the prosecutor during closing argument were improper.

As the Sixth Circuit has stated, "[w]hen a petitioner makes a claim of prosecutorial misconduct, 'the touchstone of due process analysis...is the fairness of the trial, not the culpability of the prosecutor.'"  *Serra v. Michigan Dep't of Corrections*, 4 F.3d 1348, 1355 (6th Cir. 1993) (quoting *Smith v. Phillips*, 455 U.S. 209, 219 (1982)).  The issue is whether the prosecutor's conduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process."  *Gillard v. Mitchell*, 445 F.3d 883, 897 (6th Cir. 2006) (quoting *Darden v. Wainwright*, 477 U.S. 168, 181 (1986)).  Thus, even if the challenged comments were improper, habeas relief is available only where the comments "were so flagrant as to render the entire trial fundamentally unfair."  *Gillard*, 445 F.3d at 897.  When assessing whether an improper comment resulted in a denial of the right to a fair trial, the Court must consider the following factors: (1) the likelihood that the comments mislead the jury or prejudiced the accused; (2) whether the comments were extensive or isolated; (3) whether the remarks were deliberately or accidentally presented to the jury; and (4) whether the evidence against the accused was substantial.  *Id.*

Petitioner objects to various comments by the prosecutor, as indicated below:

I.       Does the evidence support what other witnesses are

19

saying? Does it corroborate? I submit to you that Anthony, Rachel and Mindy Puente corroborate all of the other evidence. They're not the key pieces of evidence. They corroborate all of the other evidence. (Trial Transcript 1342).

II.    These four people leave Mr. Wyrick for as good as dead there on the floor. No one's going to call for help. He's bleeding. He's 89 years old. He's got one leg. He can't see out of the one eye. And they don't call for help. They just leave him there. They got their goods. (Tr. 1342).

III.   Mr. Wyrick is taken to the hospital, and he's treated at the hospital. He's stitched up in his head. I ask you to use your reason and common sense and say what intent was held in the minds of the people that are effecting that assault. What's the intent of Mr. Zerom when he's there, when Mr. Wyrick is struck in the head with a shovel? It can only be to cause great bodily harm. That's what common sense tells you.

Now, with respect to these people on the inside of this group, the people who knew the information. It's by design not discussed with outsiders. It's by design not discussed with people who don't need to know. And the real life, just the necessity of the situation is that if we are to present the plan, if we are to give you what happened - - we don't relish it. We don't like it. We don't expect you to like them or like what they did. We don't like what they did. But the reality of the situation is to find out what was planned and how it went down on the inside, is you have to bring the insiders in. It's an unfortunate fact, a necessary evil. And the law allows for it. It says accomplice testimony is okay. It's all right for the prosecutor or the police to give somebody a deal to testify. Examine it cautiously with caution and care. And look at some things. What's their motive to lie? Are they getting big benefits? Use all that. (Tr. 1344-45).

IV.    Ladies and gentlemen, the facts in this case are ugly. They are ugly. They're - - it's horrendous to rob an

20

elderly man who's weak and crippled and blind.
We're not asking you, and no element requires you to
say, do we like this person?  Do we not like this
person? Check this box.  Because I would submit and
I would bet that you're going to say, we don't like a
lot of people that are involved in this.  And that's
okay.

What your job is, is to examine all of the facts of the
case, decide what those facts are, using your reason
and your common sense.  Those facts as they apply
not to Rachel, not to Mindy, not to Anthony.  Those
are for other jurors.  Not to Barb Puente.  Not to
anybody else.  Your job is to decide the facts as they
apply to Germai Zerom, using the law that Judge
Hicks instructs, including the aiding and abetting
statute. (Tr. 1352-53).

The Court fails to discern anything improper about these (or any other) comments.

Contrary to Petitioner's assertions, there is no evidence that the prosecutor "denigrated" Petitioner,

his defense, or his witnesses.  There is likewise no evidence that the prosecutor "argued facts not in

evidence."  As for Petitioner's claim that the prosecutor improperly vouched for the credibility of

his witnesses, the Court is not persuaded.

While it is improper for an attorney to express a personal opinion or belief as to the

truth or falsity of any testimony, an attorney "must be given leeway to argue reasonable inferences

from the evidence."  *United States v. Collins*, 78 F.3d 1021, 1039-1040 (6th Cir. 1996).  Moreover,

where there is conflicting testimony, "it may be reasonable to infer, and accordingly to argue, that

one of the two sides is lying."  *Id.*  Furthermore, so long as he does not improperly vouch for a

witness, it is proper for the prosecutor to review the evidence presented and comment on the strength

of the State's case.  *United States v. Reliford*, 58 F.3d 247, 250-51 (6th Cir. 1995).  Improper

vouching occurs only when a jury could "reasonably believe that the prosecutor was indicating a

21

personal belief in a witness' credibility." *Taylor v. United States*, 985 F.2d 844, 846 (6th Cir. 1993).

The Court is, likewise, not persuaded that the prosecutor "argued civic duty and sympathy for the victim as a basis to convict." The Court recognizes that a prosecuting attorney has a "duty to refrain from improper methods calculated to produce a wrongful conviction." *Puertas v. Overton*, 168 Fed. Appx. 689, 701 (6th Cir., Feb. 13, 2006) (quoting *Viereck v. United States*, 318 U.S. 236, 248 (1943)). However, "unless calculated to incite the passions and prejudices of the jurors, appeals to the jury to act as the community conscience are not per se impermissible." *Byrd v. Collins*, 209 F.3d 486, 539 (6th Cir. 2000). There is no evidence that the prosecutor made any statements or arguments to the jury which can reasonably be interpreted as an attempt to incite their passions and prejudices.

The Michigan Court of Appeals concluded that the prosecutor's comments did not deprive Petitioner of a fair trial. *People v. Zerom*, No. 241440, Opinion at 4-5 (Mich. Ct. App., Oct. 16, 2003). In light of the above authority and facts, the Court concludes that this decision is neither contrary to, nor involves an unreasonable application of, clearly established federal law. Furthermore, this decision was not based on an unreasonable determination of the facts in light of the evidence presented. Accordingly, this claim raises no issue upon which habeas relief may be granted.

## CONCLUSION

For the reasons articulated herein, the undersigned concludes that Petitioner is not being confined in violation of the laws, Constitution, or treaties of the United States. Accordingly, the undersigned recommends that Zerom's petition for writ of habeas corpus be **denied**.

OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within ten (10) days of the date of service of this notice.  28 U.S.C. § 636(b)(1)(C).  Failure to file objections within the specified time waives the right to appeal the District Court's order. *Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Respectfully submitted,

Date:  August 18, 2008

_/s/ Ellen S. Carmody_____
ELLEN S. CARMODY
United States Magistrate Judge

23